# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

ERIC LAMONT RIAS,

       Defendant-Appellant.

UNPUBLISHED
March 30, 2017

No. 328999
Oakland Circuit Court
LC No. 2015-253453-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

EMARSUWAN CARLSTON HEADY,

       Defendant-Appellant.

No. 329183
Oakland Circuit Court
LC No. 2015-253465-FC

---

Before: MARKEY, P.J., and WILDER and SWARTZLE, JJ.

PER CURIAM.

In these consolidated appeals, defendants Eric Lamont Rias and Emarsuwan Carlston Heady appeal as of right their jury trial convictions of one count each of armed robbery, MCL 750.529. The trial court sentenced Rias to 10 to 80 years for his armed robbery conviction, while sentencing Heady to 6 to 60 years. As to both defendants we affirm but, in Docket No. 329183, we conclude that Heady is entitled to a *Crosby*[1] remand under the procedure discussed in *Lockridge*.[2]

---

[1] *United States v Crosby*, 397 F3d 103, 117-118 (CA 2, 2005), abrogated in part as recognized by *People v Stokes*, 312 Mich App 181, 199-200; 877 NW2d 752 (2015).

[2] *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

-1-

## I. FACTUAL BACKGROUND

This case arises out of a drug deal involving 20-year-old Erik Strand (the victim), which, according to the victim, culminated in an armed robbery. Before the robbery incident at issue in this case, the victim had known defendant Rias for several years. The two would "hang out with the same group of people," smoke marijuana together, and "were good friends." The victim did not know defendant Heady, having seen him only once before the robbery incident.

The day before the robbery incident, the victim purchased an ounce of marijuana, which he hoped to resell at a profit. The victim contacted Rias in hopes of finding a purchaser. The next day (i.e., the day of the robbery), Rias called the victim to inform him that Rias had located two purchasers. The transaction was set to take place at the North Hill Farms apartment complex in Pontiac, Michigan.

When the sale was arranged, the victim was with his then-girlfriend, Destiny Bartholomew. At about 6:30 p.m. or 7:00 p.m., the victim and Bartholomew drove to Rias's apartment complex and picked him up, at which time Rias asked whether they could drive his girlfriend home on their way to the drug sale. All of the witnesses agreed that the group dropped Rias's girlfriend off, then proceeded to the North Hill Farms apartment complex. But Rias and the prosecution's witnesses provided incongruent versions of what happened after the victim, Bartholomew, and Rias arrived at the apartment complex.

Rias testified that he and the victim got into a fight during the drive. According to Rias, after dropping off Rias's girlfriend, the victim asked where he could park "to roll a joint," and Rias told the victim to park in the North Hill Farms complex's parking lot. Upon parking there, the victim began to look for his marijuana, was unable to find it, and accused Rias of stealing it. The victim began "cussing" at Rias. Angered by the victim's insults, Rias—who was seated behind the victim—"jacked him up inside his car," grabbing the victim's shirt and shoving him against the car window. Rias subsequently let the victim go, exited the car, and raised his fists, ready to fight. The victim did likewise, exiting the car and putting "his guards up." But while circling backward, the victim tripped on a nearby curb and fell to the ground. Rias jumped on top of the victim, punching him "everywhere" and slapping him in the head several times. The victim threw no blows in return. Eventually, Rias left the victim there and walked across the street to a store. Rias saw the victim get up, get back into his car, and leave. Rias categorically denied that he ever used a gun to rob the victim.

By contrast, the victim testified that no fist fight ever took place. According to the victim, when he, Bartholomew, and Rias arrived at the North Hill Farms complex, Rias directed the victim to a specific apartment and the two proceeded inside, leaving Bartholomew in the car. Upon entering the "pretty small apartment" with Rias, the victim saw two other men inside, neither of whom fit the description of the purchasers Rias had described. One of the men who

had been waiting in the apartment was later identified as Heady,[3] but the other man remains unidentified. The unidentified man was an older "[b]ig guy"—he stood over six feet tall—and was much larger than the victim, Rias, and Heady. Concerned, the victim asked Rias where the purchasers were, and Rias "said they were on their way." Because Rias was the victim's "actual friend," the victim trusted that the buyers were still coming.

After they had been waiting about one minute, Rias approached the victim from behind, placed a gun against his neck, and ordered him to "run [his] pockets and give him everything," including the victim's money, cellphone, keys, wallet, and the marijuana. The victim tried to cover his pockets with his hand and asked Rias, "Are you really doing this to me right now?" Rias responded by hitting the victim "over the head with the gun."[4] Heady and the big, unidentified man came over and started taking the victim's belongings from his pockets. The men eventually succeeded in taking most of the victim's belongings, including his brand-name belt. As the robbery proceeded, Rias put the gun "in [the victim's] gut and asked [him], 'If [he] was ready to die. If [he] really wanted to lose [his] life over [his] belt and [his] weed and [his] money?'" Ultimately, the victim was permitted to leave, with Rias following the victim out of the apartment and threatening to shoot him unless he ran.

The victim admitted that he did not immediately report the robbery to the police, fearing that he might be labeled "as a snitch." But after learning that Rias would not return the stolen property, the victim filed a police report. The victim acknowledged that he initially lied to the police because he was afraid he might "get in trouble" if he admitted he was trying to sell marijuana at the time of the robbery. He subsequently agreed to testify about the marijuana sale because he had been assured that he would not be prosecuted.

At trial, the court took an offer of proof from the victim regarding bribes he testified that he had received regarding this case. Out of the presence of the jury, the victim testified, "I had two people call me on my phone and say that one would give me money and weed to not test -- or to not charge -- press charges. The other one said they would give me a Gucci belt and money to not press charges." Such offers were made to the victim "[a] week to two weeks before" defendants' preliminary examination. The victim recognized neither the voices nor the phone numbers of the people offering the bribe. Regarding a "hit" that the victim had heard was put out against him, the victim testified, "I heard about that through my friends that still affiliate with [Rias]'s friends," clarifying that it was passed along by "a friend of a friend."

Ultimately, the trial court ruled that the testimony about the "hit" was inadmissible double hearsay and that, even if admissible under a hearsay exception, its probative value was significantly outweighed by the dangers of unfair prejudice and jury confusion under MRE 403.

---

[3] The victim subsequently identified Heady both by using Rias's Facebook profile and in photographic arrays conducted by the police. The victim testified that he was "[a] hundred and fifty percent" certain about his identification of Heady.

[4] The victim testified that he was struck with the gun "[r]oughly . . . ten times," but he acknowledged that this was only his "best guess."

However, the trial judge decided that the bribery testimony was admissible as relevant credibility evidence.

Thus, the victim subsequently testified before the jury that he received three offers of compensation, two by phone and one by text message, if he would "drop" this case: "The first offer was money and a Gucci belt. The second offer was money and marijuana and the third offer was just money." The victim testified that the bribe offers were made by Rias's friends. When asked why he refused such offers, the victim replied, "Because I had already went through the process of making a police report and talking to you and because of that I also wanted to see something get done about this."

Bartholomew testified at trial for the prosecution. Her testimony was consistent with the victim's testimony in all material respects. On cross-examination, defense counsel attacked Bartholomew's credibility, questioning her about whether she lied to the police or withheld material information from them

Rias also testified at trial. We have summarized the material substance of his testimony above. Noteworthy, however, is the following exchange during the prosecution's cross-examination of Rias:

> *Q*. You heard [Bartholomew] testify that there wasn't any fight or disrespecting or -- or fist fight between you and [the victim], you heard her testify to that?

> *A*. Yeah, I heard it.

> *Q*. Any reason why she'd say that if it weren't true?

Rias's trial counsel objected, arguing that the question called for speculation and was improper because it asked Rias "to comment on another witness --" Heady's counsel also objected, contending that the prosecution's question impermissibly asked Rias "to speculate on the credibility of one witness over another," thereby invading "the province of the jury." The trial court overruled defendants' objections. Thereafter, the prosecution questioned Rias as follows:

> *Q*. So you got -- you know of no -- no reason why [Bartholomew] would have to lie about what happened?

> *A*. No, Sir.

> *Q*. Okay.

> *A*. Probably because I beat up her boyfriend.

> \* \* \*

> *Q*. But you heard her testify that . . . he is no longer her boyfriend. You heard her say that, didn't you?

*A.* Yes, Sir.

*Q.* So if your reason for you think her lying [sic] is that they were boyfriend, girlfriend, that reason is gone now, isn't it?

*A.* I would say yes, Sir.

Heady presented an alibi defense at trial but elected not to testify. Defendants were convicted and sentenced as noted above, and these appeals ensued.

## II. STANDARDS OF REVIEW

On appeal, defendants raise several claims of error, thereby implicating several standards of review.

> This Court reviews for an abuse of discretion the trial court's decision to admit or exclude evidence. The trial court abuses its discretion when its decision falls outside the range of principled outcomes or when it erroneously interprets or applies the law. We review de novo the preliminary questions of law surrounding the admission of evidence, such as whether a rule of evidence bars admitting it. [*People v Lane*, 308 Mich App 38, 51; 862 NW2d 446 (2014) (footnotes omitted).]

"This Court reviews de novo a defendant's claim of a constitutional due-process violation." *People v Jackson*, 292 Mich App 583, 590; 808 NW2d 541 (2011), including whether alleged prosecutorial misconduct deprived a defendant of the right to a fair trial, *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). The proper interpretation and application of a statute also poses a question of law that is reviewed de novo. *People v Zajaczkowski*, 493 Mich 6, 12; 825 NW2d 554 (2012).

On the other hand, "[w]hether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). "Where claims of ineffective assistance of counsel have not been preserved, our review is limited to errors apparent on the record." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

As explained in *People v Steanhouse*, 313 Mich App 1, 38; 880 NW2d 297 (2015), notwithstanding *Lockridge* this Court continues to apply the standard of review enunciated by *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), when reviewing a trial court's scoring of OVs. "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *Hardy*, 494 Mich at 438. "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id.* Reasonable inferences from record evidence may be relied upon in scoring OVs. *People v Earl*, 297 Mich App 104, 109; 822 NW2d 271 (2012). The proper interpretation and application of a statute poses a question of law reviewed de novo. *People v Zajaczkowski*, 493 Mich 6, 12; 825 NW2d 554 (2012).

Unpreserved issues regarding jury selection are reviewed for plain error affecting the defendant's substantial rights, *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007), as are unpreserved constitutional issues, *People v Henry (After Remand)*, 305 Mich App 127, 160; 854 NW2d 114 (2014). "To establish plain error requiring reversal, a defendant must demonstrate that 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.* (quotation marks and citation omitted). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

III. ANALYSIS

A. "ANONYMOUS" JURY

Defendant Rias first argued that the trial court plainly erred by referring to prospective jurors by numbers rather than names. Alternatively, Rias argues that we should declare a "but for" conflict with *Hanks*, 276 Mich App at 93 (holding that a defendant had failed to demonstrate that a trial court's practice of referring to prospective jurors by number, rather than name, constituted plain error warranting reversal), pursuant to MCR 7.215(J). We disagree in both respects.

Because Rias did not object to the trial court's practice of referring to prospective jurors by numbers, this issue is unpreserved and our review is for plain error affecting Rias's substantial rights. *Id.* at 92. Rias's instant claim of error is fatally flawed because he acknowledges that the trial court's ruling comported with the rule of law set forth in *Hanks*. The trial court could not have *plainly* erred by following *Hanks*, which is a decision that the trial court was *bound* to follow. See MCR 7.215(C)(2); *People v Herrick*, 277 Mich App 255, 258; 744 NW2d 370 (2007) (noting that a rule of law announced by this Court in a published opinion is—unless overruled, modified, or consisting of obiter dictum—binding upon lower courts).

Moreover, because we believe *Hanks* was properly decided, we decline Rias's invitation to declare a conflict with Hanks. "An 'anonymous jury' is one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public." *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). "[T]he use of an 'anonymous jury' may promote the safety of prospective jurors, but at a potential expense to two interests of the defendant: (1) the defendant's interest in being able to conduct a meaningful examination of the jury and (2) the defendant's interest in maintaining the presumption of innocence." *Id.* at 522-523. "In order to successfully challenge the use of an 'anonymous jury,' the record must reflect that the parties have had information withheld from them, thus preventing meaningful voir dire, or that the presumption of innocence has been compromised." *Id.* at 523.

As the prosecution notes, it will be a rare case in Michigan that employs a truly "anonymous" jury because, pursuant to MCR 2.510(C), prospective jurors "shall" complete and return a personal history questionnaire prepared by the State Court Administrative Office and the parties' "attorneys must be given a reasonable opportunity to examine the questionnaires before being called on to challenge for cause." The form questionnaires provide defense attorneys with a wealth of information about the jurors, including their names. Given the general availability of the prospective jurors' names to defense counsel, *Hanks* properly decided that a defendant with

an unpreserved claim of error in this regard should have the burden of establishing either (1) that information about jurors was withheld from the defendant and the withholding of such information prevented meaningful voir dire, or (2) that the presumption of innocence was compromised by the trial court's practice of referring to jurors by numbers. See *Hanks*, 276 Mich App at 93-94.

In any event, *Hanks* is controlling here. As was true in *Hanks*, 276 Mich App at 94, the record in the instant case provides "no indication that any of the jurors believed that there was any significance in the use of numbers instead of names. Further, [Rias has] failed to demonstrate that the use of numbers prevented him from conducting meaningful voir dire or that his presumption of innocence was compromised." "Thus, [Rias] has not established that plain error affected his substantial rights." See *id*.

## B. JUROR-SUBMITTED QUESTIONS

Rias next argues that, "as a matter of law reform," this Court should hold that the juror-posed questions in this case represented a structural error that necessarily entitles Rias to a new trial. We disagree.

Because Rias failed to object to the juror-posed questions below, this issue was never addressed or decided below and is, as such, unpreserved. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). And as Rias acknowledges in his brief on appeal, his instant argument is directly contrary to both MCR 2.513(I) and *People v Heard*, 388 Mich 182, 188; 200 NW2d 73 (1972) ("We hold that the questioning of witnesses by jurors, and the method of submission of such questions, rests in the sound discretion of the trial court. The trial judge may permit such questioning if he wishes"). Consequently, Rias's instant claim of error cannot succeed before this Court. "As long as case law established by our Supreme Court remains valid, this Court and all lower courts are bound by that authority." *People v Tierney*, 266 Mich App 687, 713; 703 NW2d 204 (2005).

## C. BRIBERY EVIDENCE

Defendants each posit that, because there was an insufficient nexus linking the bribe offers to defendants, the trial court denied defendants of due process by permitting the victim to testify that he received bribes to "drop" his case against defendants. We disagree.

An evidentiary error rises to the level of a constitutional due process violation if the error "so infect[s] the trial with unfairness" as to deny the defendant of the right to a fair trial. *People v Blackmon*, 280 Mich App 253, 270; 761 NW2d 172 (2008). See also *Michigan v Bryant*, 562 US 344, 371 n 13; 131 S Ct 1143; 179 L Ed 2d 93 (2011) ("[T]he Due Process Clauses of the Fifth and Fourteenth Amendments may constitute a further bar to admission of, for example, unreliable evidence."); *Montana v Egelhoff*, 518 US 37, 53; 116 S Ct 2013; 135 L Ed 2d 361 (1996) (opinion of SCALIA, J.) ("[E]rroneous evidentiary rulings can, in combination, rise to the level of a due process violation").

"All relevant evidence is admissible," and the converse is equally true: "[e]vidence which is not relevant is not admissible." MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." MRE 401. Our Supreme Court has "consistently reaffirmed" its holding in *People v MacCullough*, 281 Mich 15, 26; 274 NW 693 (1937), that "[t]he interest or bias of a witness has never been regarded as irrelevant" because "[i]t goes directly to his credit, and must determine, with the jury, how far facts depending on his evidence are to be regarded as proven." *People v Layher*, 464 Mich 756, 764; 631 NW2d 281 (2001). See also *People v Coleman*, 210 Mich App 1, 8; 532 NW2d 885 (1995) ("The credibility of a witness is always an appropriate subject for the jury's consideration. Evidence of a witness' bias or interest in a case is highly relevant to credibility."). Even relevant evidence may, however, be excluded under MRE 403 if, despite its relevancy, the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403; *People v Cooper*, 309 Mich App 74, 82; 867 NW2d 452 (2015).

Here, the bribery evidence was directly relevant to not just *a* fact of consequence at trial but *the* fact of consequence: witness credibility. Given the conflicting testimony of Rias and the prosecution's witnesses, this case boiled down to credibility. If believed, the victim's testimony that he received offers from Rias's "friends" to have his stolen property (or its equivalent) returned to him—in exchange for dropping his case against defendants—strongly supports the veracity of the victim's testimony that the robbery actually occurred. The bribery evidence simultaneously undermines Rias's credibility. Such evidence also, if accepted by the jury, tended to bolster the victim's credibility, suggesting that he had taken the honest course, refusing inducements that were intended to subvert the ends of justice. Because such evidence was highly relevant, its probative value was not substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury.[5] The trial court did not abuse its discretion by admitting the bribery evidence.

---

[5] Additionally, we find *People v Long*, 144 Mich 585; 108 NW 91 (1906), to be distinguishable from the instant case. In *Long*, our Supreme Court held that the prosecution should not admit evidence that a witness was bribed "unless able to offer some testimony tending to show that the defendant procured the offer to be made, or that it was made with his approval or acquiescence." *Id.* at 585-586. Unlike the witness in *Long*, however, in this case the victim's testimony about the bribe offers provided circumstantial evidence from which a rational trier of fact could infer that defendants procured the bribe offers or that such offers were made with defendants' approval or acquiescence. The victim testified that the bribe was offered to him by Rias's friends. Essentially, the offers were for the return of the victim's stolen property or its equivalent, and from such testimony it can be reasonably inferred that the offerors knew what property had been stolen from the victim. That inference, in concert with the fact that defendants had a clear motive to prevent the victim from testifying, constituted circumstantial evidence that the bribe offer was made either at the behest of defendants or with their approval or acquiescence. Accordingly, this case is distinguishable from *Long*, in which such evidence was evidently lacking.

Moreover, because it was admissible, we conclude that the bribery evidence did not so infect defendants' trial with unfairness as to rise to the level of a constitutional due process violation. On the contrary, the admission of the bribery evidence was altogether fair. The jury was free to either accept or reject the victim's testimony regarding the purported bribes. See *People v Schumacher*, 276 Mich App 165, 180; 740 NW2d 534 (2007). That the jury ultimately found the victim's testimony to be more credible than that of Rias, and therefore convicted defendants of armed robbery, does not make the introduction of the bribery evidence unfair.

## D. PROSECUTORIAL MISCONDUCT[6]

Finally, Rias argues that the prosecution improperly cross-examined him regarding the credibility of Bartholomew's testimony. Although we agree that such questioning was improper, we nevertheless conclude that reversal is unwarranted here.

Rias preserved this issue by objecting at trial on the same grounds he now argues on appeal. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). In *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985), our Supreme Court ruled that it is "improper for the prosecutor to ask [a] defendant to comment on the credibility of prosecution witnesses." See also *People v Ackerman*, 257 Mich App 434, 449; 669 NW2d 818 (2003) ("A prosecutor may not ask a defendant to comment on the credibility of prosecution witnesses because a defendant's opinion of their credibility is not probative."). "However, the *Buckey* Court also ruled that such questions are curable with a limiting instruction." *People v Messenger*, 221 Mich App 171, 180; 561 NW2d 463 (1997).

Here, the prosecution was permitted, over defendants' objections, to ask Rias whether he knew of any reason that Bartholomew would be untruthful. Such questions improperly asked Rias to comment on the credibility of a prosecutorial witness. Moreover, unlike the defendant in *Buckey*, who "dealt rather well with the questions" improperly posed by the prosecution, *Buckey*, 424 Mich at 17, in this case Rias dealt with such questions poorly. He admitted that he could not explain why Bartholomew would perjure herself for the victim when she was no longer dating him.

Even so, reversal is unwarranted. Our conclusion in this regard hinges on our decision that the preserved error at issue here does not constitute *constitutional* error. "[I]n order for prosecutorial misconduct to be constitutional error, the misconduct must have *so infected the trial with unfairness as to make the conviction a deprivation of liberty without due process of law*." *Blackmon*, 280 Mich App at 269. In the instant case, the improper prosecutorial questions did not so infect defendants' trial with unfairness as to rise to the level of a due process violation. Notably, the prosecution's improper questioning of Rias was brief. Additionally, as the prosecution duly notes, "[j]urors are presumed to follow instructions, and instructions are presumed to cure most errors." *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008).

---

[6] We employ the phrase "prosecutorial misconduct" as a term of art synonymous with "prosecutorial error," not as a suggestion that the prosecution engaged in intentional misconduct. See *People v Jackson*, 313 Mich App 409, 425; 884 NW2d 297 (2015).

At the conclusion of the trial, the jury was instructed that it was "free to believe all, none or part of any person's testimony," that where witness testimony conflicted, it was the jury's prerogative to "decide which testimony [it would] accept," and that in weighing witness credibility, it should consider whether each witness had "any special reason to tell the truth or any special reason to lie. . . ." We presume that the jurors followed such instructions, understanding that it was their duty—not Rias's—to decide whether Bartholomew was credible and whether she had a reason to be untruthful. Also, on cross-examination the defense was able to undermine Bartholomew's credibility rather well, pointing out that she and the victim initially withheld information from the police. Viewed in the context of the entire record, we are not convinced that the prosecution's improper questions were so unfair that they effectively denied Rias of due process.

Pursuant to MCL 769.26, it is "presume[d] that a preserved, nonconstitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999). Given the trial court's jury instructions discussed above, Rias has failed to rebut the presumption that the error here was harmless. Upon plenary review of the record, we are unpersuaded that it is more probable than not that the prosecution's improper cross-examination of Rias was outcome determinative.

## E. EFFECTIVE ASSISTANCE OF COUNSEL

Heady argues that his trial counsel performed ineffectively by failing to request a limiting instruction regarding the bribery evidence. Thus, Heady argues, he is entitled to a new trial. We disagree.

Heady failed to preserve this issue by moving for either a new trial or a Ginther[7] hearing in the trial court; hence, our review is for error apparent on the record. See *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000).

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. A defendant must also show that the result that did occur was fundamentally unfair or unreliable. [*People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012) (citations omitted).]

The "reviewing court must not evaluate counsel's decisions with the benefit of hindsight," but should "ensure that counsel's actions provided the defendant with the modicum of representation" constitutionally required. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Because counsel may find it more prudent not to draw attention to an issue, the decision whether

---

[7] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

to request a limiting instruction is a matter of trial strategy. *People v Rice*, 235 Mich App 429, 445; 597 NW2d 843 (1999). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008).

In this case, Heady has failed to cite any record evidence to rebut the strong presumption that his counsel's decision regarding the limiting instruction was both strategic and effective. As was true in *Rice*, 235 Mich App at 445, here, despite Heady's "contention that the instruction could only have helped him, it may have been . . . counsel's strategy to downplay" this issue by refraining from requesting a limiting instruction. Because Heady has not rebutted the presumption that his counsel employed effective trial strategy, his instant claim of error necessarily fails.

## F. SENTENCING

Heady contends that the trial court erred by assessing OV 1 at 15 points and OV 2 at 5 points. Alternatively, Heady contends that his sentence was unreasonable. We conclude that the trial court's assessment of the OVs does not constitute error requiring reversal. Nevertheless, Heady's reasonableness challenge entitles him to a *Crosby* remand.

"MCL 777.31 governs the scoring of OV 1 and pertains to the aggravated use of a weapon." *People v Bosca*, 310 Mich App 1, 49; 871 NW2d 307 (2015). In pertinent part, MCL 777.31 provides,

> Score offense variable 1 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> * * *
>
> (c) A firearm was pointed at or toward a victim . . . 15 points. . . .

The trial court assessed Heady 15 points for OV 1, reasoning that it had been proven "beyond a preponderance of the evidence that a gun was used."

We perceive no error in the trial court's assessment of OV 1. The victim testified that Rias pointed a handgun both at the victim's neck—indeed, that Rias actually placed the barrel of the gun *against* the victim's neck—and that Rias also shoved the gun "in" the victim's "gut." From the sight of it and the feel of it against his skin, the victim testified that he "kn[e]w it was a real gun," describing it as a pistol. Hence, the trial court did not clearly err by determining that a gun was pointed at the victim during the robbery. Given the trial court's finding in that regard, it was fitting to assess Heady 15 points for OV 1 under MCL 773.31(1)(c).

Given that conclusion, we need not consider whether the trial court erred by assessing 5 points to Heady for OV 2. "Where a scoring error does not alter the appropriate guidelines range, resentencing is not required." *People v Francisco*, 474 Mich 82, 91 n 8; 711 NW2d 44 (2006). Heady had a prior record variable (PRV) score of 5 points and, as assessed by the trial court, a total OV score of 25 points. Under MCL 777.16y, Heady's sentencing offense, armed

robbery, is classified as a crime against a person and a "Class A" felony. Hence, the five points the trial court assessed heady under OV 2 could not have altered his sentencing guidelines, see MCL 777.62, and he is unentitled to resentencing on that basis.

Nevertheless, because he alternatively challenges the reasonableness of his upward departure sentence, Heady is entitled to a *Crosby* remand. Heady was sentenced on the afternoon of July 30, 2015—the day after *Lockridge* was decided—and the trial court made comments indicating that it was aware of both *Lockridge* and its holding. But at the time Heady was sentenced, this Court had not yet clarified what reasonableness "standard" was applicable in the wake of *Lockridge*. See *Steanhouse*, 313 Mich App at 42-48 (deciding that "the principle of proportionality established under *Milbourn*, and its progeny, is now the appropriate standard by which a defendant's sentence should be reviewed"). As was true in *Steanhouse*, here "the trial court was unaware of, and not expressly bound by, a reasonableness standard rooted in the *Milbourn* principle of proportionality at the time of sentencing." *Id*. at 48.

Therefore, Heady is entitled to a *Crosby* remand, as described in *Lockridge*. See *id*. at 48-49. "Given the possibility that [he] could receive a more severe sentence, [Heady] should be provided the opportunity to avoid resentencing if that is his desire." See *id*. Heady "may elect to forgo resentencing by providing the trial court with prompt notice of his intention to do so. If notification is not received in a timely manner, the trial court shall continue with the *Crosby* remand procedure as explained in *Lockridge*." See *id*. at 49 (quotation marks and citations omitted).

## IV. CONCLUSION

As to both defendants, we affirm. But in Docket No. 329183, we remand Heady's case to the trial court for *Crosby* proceedings as discussed *supra*. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Kurtis T. Wilder
/s/ Brock A. Swartzle

-12-